No. 128,971

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the MAX HACKER FAMILY TRUST.

SYLLABUS BY THE COURT

1.

The Trust Code, K.S.A. 58a-1010, authorizes claims against a trustee other than breach of trust but provides that independent claims under tort and contract law would be subject to the substantive law appropriate to those claims—including the applicable statute of limitations.

2.

If a claim against a trustee may be viewed both as a tort claim that would be barred by the applicable statute of limitations for tort under K.S.A. Chapter 60, Article 5, yet also as a breach of trust claim that may survive the limitations specific to the Trust Code in K.S.A. 58a-1005, a court faced with summary judgment is obligated to view the claim as one that could survive the procedural bar.

3.

K.S.A. 58a-1005 addresses the limitation of action against a trustee. Under K.S.A. 58a-1005(c), where the reporting requirements of subsection (a) do not apply, a judicial proceeding by a beneficiary for breach of trust must be commenced within two years after the first to occur of: (1) The removal, resignation, or death of the trustee; (2) the termination of the beneficiary's interest in the trust; or (3) the termination of the trust.

1

4.

The limitation set forth in K.S.A. 58a-1005(c)(2) does not state that the defining event is the termination of a beneficiary's interest in some part of the corpus of the trust but the termination of all interest in the trust. As a result, the sale or transfer of some of the property held by the trust, even if done in violation of the terms of the trust, does not trigger K.S.A. 58a-1005(c)(2) so long as some property remains in the trust.

5.

Where a trust contains clear provisions for the creation of a sub-trust on the death of the settlor, such sub-trust is created automatically upon the death of the settlor. This comports with the "other disposition taking effect upon the settlor's death" under K.S.A. 58a-401(1), outlining how a trust may be created. Although a trust is typically not created until it receives property, this automatic transfer operates as a pourover devise and constitutes the property interest creating the trust.

6.

A sub-trust created by the express language of a trust directing its creation upon the settlor's death can come into existence immediately at the settlor's death and not necessarily only upon the later transfer of title to property into the newly created trust by the trustee. Administrative requirements for the trust, such as tax requirements, are a separate and independent requirement for the *administration* of the trust, which is distinct from the trust's *creation*.

Appeal from Trego District Court; GLENN R. BRAUN, judge. Oral argument held April 14, 2026. Opinion filed July 24, 2026. Reversed and remanded with directions.

*Christopher J. McGowne* and *Craig L. Uhrich*, of McGowne Uhrich LLC, of Oakley, for appellant Max Hacker Family Trust, by and through Terena Ranee Becker as beneficiary, and Terena Ranee Becker in her individual capacity.

2

*Christopher W. Sook* and *Michael J. Baxter*, of Jeter Law Firm LLP, of Hays, for appellee Janice K. Hacker as trustee of the Max Hacker Family Trust.

Before COBLE, P.J., HURST, J., and PAULA HOFAKER, District Judge, assigned.

COBLE, J.: As the district court aptly observed: "This case is an example of money and property dividing a family." Terena Becker, daughter of Max and Janice Hacker and a named beneficiary of the Max Hacker Family Trust, appeals the district court's order granting summary judgment in favor of Janice Hacker, trustee, on Terena's various legal challenges to her mother's alleged misappropriation of trust assets. Terena contests the district court's application of the statutes of limitations, the district court's conclusion that Terena lacked standing to sue, that Janice did not wrongfully transfer trust assets, and that Janice was entitled to reimbursement of her attorney fees. On review, we find that the statute of limitations did not prevent Terena's action and she possesses standing, and that questions remain which preclude summary judgment on the merits of her claims. All these issues are examined in detail below.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2018, after Max Hacker received a diagnosis of a terminal illness, he and his wife, Janice, sought legal assistance in estate planning. Their attorney at that time advised and assisted with the creation of two inter vivos trusts: the Max Hacker Trust and the Janice K. Hacker Trust. Both trusts were revocable during the lives of the grantors, and each trust provided the grantor unlimited income throughout his or her lifetime. Each spouse was listed as the successor trustee of the other's trust if they survived the other.

The primary difference between Max's trust and Janice's trust is that upon Max's death Max's trust allowed the couple's two children, Terena Becker and Timothy Hacker, an allowance of $3,000 per month throughout their lives but left the balance of the trust

3

corpus to his grandchildren. Janice's trust, though, upon her death divided the corpus between Terena and Timothy.

Originally, Max and Janice divided their collective assets equally among the two trusts. In separate, mirror documents titled "Schedule A" attached to each trust, five investment accounts owned by the couple were to be divided equally ("undivided one-half") between the Max Hacker Trust and the Janice K. Hacker Trust. In separate, mirror documents titled "Schedule B" attached to each trust, Max and Janice each signed Deeds of Transfer expressing their intent to transfer all their respective interests in personal property and real estate into the two trusts, including "all real and personal property that [they] may acquire" thereafter. In compliance with this intent, one month after the Trusts came into existence, Max and Janice executed a quitclaim deed of their real property, transferring undivided half-interests of the property to each of their respective trusts, in July 2018.

After learning that his illness had progressed and that he had a short time to live, Max returned to his attorney to modify the property in each of the trusts, based on the recommendation of his investment advisor. The advisor recommended consolidation of most of the investment portfolios into one trust to take advantage of the taxation rules after Max died. As a result, in August 2018, Max and Janice moved most of their investment income into Max's trust, including investments held in Janice's name. Max and Janice did not transfer a similar amount of property from Max's trust into Janice's trust, aside from the Oppenheimer Fund worth $110,419.55, at the time. This represented the only investment account transferred into the Janice K. Hacker Trust from the investments identified on Schedule A of the two trusts. Although each trust still retained undivided half-interests in the couple's real property, with the allocation of the investments into Max's trust, the corpus of Janice's trust was of significantly lower value than the corpus of Max's trust. The trusts were not revised again before Max died on March 15, 2019.

4

By the terms of the Max Hacker Trust, upon Max's death, Janice took on dual roles as trustee of both the Max Hacker Trust and her own trust. By the terms of Article V of the Max Hacker Trust, upon Max's death if Janice survived him, the trust property was to be disposed of in three primary ways, by transfer of tangible nonbusiness trust property to Janice and creation of two sub-trusts:

"A. <u>Tangible, Nonbusiness Trust Property.</u> Trustee shall transfer all tangible, nonbusiness trust property, including (but not by limitation) jewelry, clothing, furniture, furnishings, hooks, pictures, and automobiles, to Grantor's wife.

"B. <u>Max Hacker Family Trust</u>.
    1. Trustee shall set aside as a separate trust to be named the Max Hacker Family Trust, the largest amount that can pass free of United States Estate Tax by reason of the unified credit and the state death tax credit . . . .
. . . .
"C. <u>Max Hacker Marital Trust</u>. Trustee shall set aside the remainder of the trust property as a separate trust to be named the Max Hacker Marital Trust . . . ."

With regard to the two sub-trusts, the Max Hacker Marital Trust ("Marital Trust") was to be created only if needed to avoid adverse tax consequences which could result from placing all the property into the Max Hacker Family Trust ("Family Trust"). But the collective assets and tax rules at the time of Max's death did not require the creation of the Marital Trust, as the trust assets would fit into the Family Trust without adverse tax consequences.

The parties dispute whether the Family Trust was created automatically by the terms of the Max Hacker Trust at Max's death or whether Janice, the successor trustee, was required to take specific action to create the Family Trust. After Max's death, Janice sought advice from a different attorney who had not drafted the trusts, Stacey Seibel, about administering the Max Hacker Trust. Seibel claimed that, though Janice did not

formally open a separate Family Trust, Janice administered the remaining property in the Max Hacker Trust under the terms of the Family Trust.

Seibel advised Janice that the Max Hacker Trust permitted the trustee to facilitate tax planning and to combine trusts for ease of administration. As a result, Seibel believed although Janice was obligated to administer the trust under the terms of the Family Trust, she could, in effect, simply treat the Max Hacker Trust as the Family Trust. Seibel claimed that although Janice did not formally open a separate Family Trust, after Max's death she administered the Max Hacker Trust under the terms of the Family Trust.

In concluding this was appropriate, Seibel relied on the portion of the Kansas Uniform Trust Code, K.S.A. 58a-816(3), which allows the trustee to exchange or change the character of trust property, and Article X of the Max Hacker Trust related to the powers of a trustee, specifically Section J, which reads:

> "J. <u>Power to Divide or Consolidate Trust</u>. Trustee, in Trustee's sole discretion, has the power to divide property in any trust being held under this instrument, and the power to consolidate the property in any number of trusts being held under this instrument, into one or more trusts as Trustee deems advisable to facilitate the operation of the trust or to facilitate tax planning."

Seibel also helped Janice to revise her trust. Based on Max and Janice's reported initial intent to divide their property relatively equally, then the unequal investments moved before Max's death, Seibel advised Janice that she could transfer all interests in real property from the Max Hacker Trust to her trust to balance the values of the corpus. Seibel also believed that moving the real estate into a single trust, rather than handling half-interests of the real estate between two trusts, made management of the real estate easier and less costly and simply consisted of "moving different classes of assets between the two trusts."

6

In September 2019, Seibel prepared a trustee's deed which Janice executed, transferring the undivided half interest in real property held in Max's trust into Janice's trust. Janice did not compensate the Max Hacker Trust for the transfer of this property. According to Seibel, this equalized the values of the two trusts, since the investments remained within the Max Hacker Trust, while the real property was in Janice's trust.

Seibel also opined that Janice was not required to provide an accounting report to her children and grandchildren about the assets in the trust at the time of Max's death because the accounting provision in the Max Hacker Trust is ambiguous, and the Uniform Trust Code requires an accounting only to the spouse, if the surviving spouse and descendants are the only beneficiaries.

Seibel assisted Janice in modifying her trust, which she restated on September 11, 2019. In her updated trust, Janice continued to treat Terena and Timothy equally, with each to receive an equal, one-half share of the trust assets, in trust, to be held and paid for their benefit during their lifetimes, and for their children's benefit during their respective lifetimes.

In October 2022, Terena—on behalf of the "Max Hacker Family Trust" as its beneficiary—filed suit against her mother, individually and as trustee of the Max Hacker Trust, and against Timothy, individually, for misappropriation of trust assets. Terena brought various claims against Janice, including breach of fiduciary duty, breach of trust, conversion, embezzlement, and failing to provide the beneficiaries with regular accounting. Terena claimed Timothy committed breach of trust and conversion. In January 2024, Terena amended her petition, raising the same claims but adding her three children as additional plaintiffs.

After Terena filed this lawsuit, Janice again modified her trust, excluding Terena as a beneficiary of Janice's trust and arranging for the share Terena would have received

7

under prior versions of the Janice K. Hacker Trust to be distributed in trust for the benefit of Terena's children.

In November 2022, Janice sold approximately 40 acres of the real property held in the Janice K. Hacker Trust to unrelated parties, but the remainder of the real estate remains in the Janice K. Hacker Trust. Terena testified that she and her husband knew that Janice wanted to sell the property prior to May 2021, before filing the lawsuit, and they suggested to Janice that instead of selling the acreage, she distribute the land to them and some other property to Timothy, but Janice did not. After selling the land, Janice placed the proceeds of the sale into her trust. None of the proceeds were placed in the Max Hacker Trust. No other real estate transfers have occurred since Max's death, aside from the 2019 transfers from Max's trust to Janice's trust, and the sale of the 40 acres in November 2022.

Some personal property, including farm equipment, was sold by online auction after Max's death. Janice had also drawn funds from the Max Hacker Trust to be used for her own support and maintenance. The withdrawals from the trust have exceeded the income generated, although the total value of the investments in the Max Hacker Trust had increased, as of December 2022, more than 20 percent.

After discovery, the parties filed competing summary judgment motions before the district court. The parties argued their respective positions at a hearing on November 6, 2024. At this hearing, Terena's counsel conceded that they did not oppose Timothy's motion for summary judgment and that summary judgment was appropriate on those claims. Terena's counsel also conceded that Janice's individual liability was not supported and so those claims should be dismissed. As a result, the remaining claims involved only Janice as trustee.

Following the hearing, the district court issued its summary judgment ruling in favor of Janice and denied Terena's motion. The district court largely adopted Janice's version of the facts, finding Terena did not properly contest those facts. The district court, however, also adopted most of Terena's facts, except specifically identified portions controverted by Janice. The district court granted summary judgment in favor of Janice on three bases: (1) the petition was barred by the applicable statute of limitations; (2) Terena, as a beneficiary of the Family Trust, lacked standing because the Family Trust was never created and Terena could not sue in her individual capacity; and (3) on the merits, Janice did not breach her fiduciary duties or the terms of the trusts in her execution of her duties as trustee of the Max Hacker Trust.

In a separate order, the district court awarded attorney fees to Janice based on K.S.A. 58a-1004 and authorized repayment of Janice's costs as trustee from the Max Hacker Trust. But the court isolated some of the attorney fees and litigation costs and required Terena, personally, to repay those amounts as sanctions for discovery violations and filing misconduct; specifically, that Terena "may have perpetrated fraud upon counsel and the court concerning the addition of her children . . . as named plaintiffs in the amended petition."

Terena timely appealed the summary judgment and attorney fees and sanctions rulings. Subsequently, the district court entered an order approving the reasonableness of Janice's requested attorney fees and costs and awarded Janice $8,466.33 in attorney fees and $1,130.98 in costs for a total sanction of $9,597.31 payable by Terena. Terena did not file another notice of appeal, but she filed a motion seeking to stay the sanctions order pending resolution of this appeal. Our court remanded the case to the district court for hearing on the requested stay.

On remand, the district court held a hearing during which it ordered it would issue a stay upon Terena's posting of a supersedeas bond and permitted her 30 days in which to

do so. The bond was conditioned on the amount of the original sanction of $9,597.31 plus interest accumulating during the appeal, ultimately bringing the required bond coverage to $11,200.72.

On April 2, 2026, before this appeal was argued, Terena's counsel filed a Status Update, reporting that the district court had "ruled against a stay" and that Terena "ultimately settled the outstanding debt and thus the matter was addressed. All related motions are moot." As discussed in Section V below, we ordered the parties to provide supplemental briefing on the issue of acquiescence to the sanctions order. We have now considered all briefing and are prepared to rule.

REVIEW OF TERENA'S APPELLATE CHALLENGE

I. *Scope of Review*

As we examine the issues on appeal, we must first recall the legal standards applicable to our review of a summary judgment ruling. An appellate court's standard of review on an appeal from summary judgment is well-established.

When a party moves for summary judgment, a district court is required to resolve all reasonable facts and inferences in favor of the party against whom summary judgment is sought. If the pleadings, available discovery, and affidavits reveal the lack of a genuine issue of material fact so that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. A party opposing summary judgment, however, must present evidence establishing a dispute of material fact, meaning that the facts subject to dispute affect the conclusive issues in the case. See *Zaragoza v. Board of Johnson County Comm'rs*, 320 Kan. 691, 697, 571 P.3d 545 (2025) (citing *Fairfax Portfolio LLC v. Carojoto LLC*, 312 Kan. 92, 94-95, 472 P.3d 53 [2020]). An appellate court applies this same standard and conducts an unlimited review of the district court's summary judgment

ruling. *Hammond v. San Lo Leyte VFW Post #7515*, 311 Kan. 723, 727, 466 P.3d 886 (2020).

As noted above, all parties filed competing motions for summary judgment before the district court. But, during the summary judgment hearing, Terena conceded that she had failed to establish any claim of individual liability by either Timothy or Janice and that those individual parties should be dismissed from the lawsuit. Janice did not cross-appeal the summary judgment rulings. Accordingly, we only consider the court's rulings on summary judgment pertaining to Janice's liability as trustee.

The district court noted that Terena's response to Janice's motion for summary judgment did not comply with Kansas Supreme Court Rule 141 (2026 Kan. S. Ct. R. at 220). This rule requires numerated paragraphs corresponding to the factual allegations presented by the movant registering whether the facts are admitted or controverted. As a result, the district court adopted the uncontroverted facts submitted by Janice. The court also adopted the uncontroverted factual statements in Terena's motion for summary judgment but excluded those facts specifically controverted by Janice. Terena does not challenge the district court's finding that she violated Supreme Court Rule 141 by failing to properly controvert the defendants' factual allegations in Janice's memorandum in support of summary judgment, so any such challenge is abandoned. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020).

The Kansas Supreme Court, consistent with Rule 141, has directed appellate courts not to entertain an attempt to controvert facts on appeal that were not properly controverted in the district court. *Plummer Development, Inc. v. Prairie State Bank*, 248 Kan. 664, 666-67, 809 P.2d 1216 (1991). But though they may take issue with one another's statements, neither party challenges the district court's factual findings, so any such challenge is likewise abandoned.

11

Within this framework, we address Terena's appellate challenges.

II.    *Statute of Limitations and Procedural Bars*

Terena first challenges the district court's application of the statute of limitations to bar her remaining claims against Janice, as trustee. To address her claim, we first identify the limitations argument presented to the district court and the court's ruling.

In her motion for summary judgment, Janice argued that any of Terena's claims "*related to any personal property* should be barred by the statute of limitations or estoppel." (Emphasis added.) In this argument, Janice referenced the distribution of Max's personal property between Terena and Timothy, and the auction of personal property in 2019. But Janice also specifically referenced the conveyance of real estate from Max's trust to Janice's trust in September 2019. Janice contended that if "Terena was not satisfied with the distribution of personal property or the transfer of the real estate, she could have taken action in 2019 instead of waiting until October 2022 to file suit," relying solely on the two-year limitations period found in K.S.A. 60-513(a)(2). Terena responded, in part, that Janice relied upon the wrong statutory limitations period, and that instead of K.S.A. 60-513, the Kansas Uniform Trust Code (Trust Code) and K.S.A. 58a-1005 must apply.

The district court found that Terena was correct and that, rather than K.S.A. 60-513(a)(2) applying to bar her action, the court must apply K.S.A. 58a-1005 of the Trust Code. However, the court found Terena's claims barred under the Trust Code. Relying on our court's opinion in *Miller v. Miller*, No. 125,952, 2024 WL 4521959 (Kan. App. 2024) (unpublished opinion), *rev. denied* 320 Kan. 862 (2025), the court found that Janice's transfer of all real estate from Max's trust to her trust as recorded with the register of deeds on September 23, 2019, commenced the running of the limitations period. Because this lawsuit was not filed until October 21, 2022, the suit was filed outside the two-year

12

statute of limitations, barring the lawsuit. Additionally, because Janice failed to transfer any assets to the Family Trust, the Family Trust was devoid of any assets, "and thus the Family Trust beneficiaries' interest was terminated. The same logic [from *Miller*] applies, and the statute would have commenced in 2019 which bars these claims as well." Finally, the court found:

> "If Terena is making any claim for breach by Janice related to the auction of the farm machinery or transfers of personal property to herself and her brother, those claims too are barred as they are more than two years prior to the filing of the lawsuit. In addition, Terena participated in the division of personal property and received the benefit from that transfer, so she is estopped from any claims against her mother related to those transfers."

This case is made more difficult by Terena's imprecise claims and both parties' briefing, each of which occasionally conflates well-known legal terminology, such as "real" and "personal" property. For example, Janice's Memorandum in Support for Summary Judgment raises the statute of limitations defense to claims related to "any *personal* property"—yet then goes on to address the transfer of real estate. The apparent reason behind this conflation is elucidated later in this opinion but at this juncture, we merely point out the difficulties created by such usage. Even so, both parties argued that a particular limitations period applied to all claims, even though they disagree about which limitations period applied.

In its summary judgment ruling, the district court held that the general statute of limitations found in Chapter 60 did not apply to the claims against the trustee and that those claims were governed by the Trust Code. We are tasked with deciding first whether the district court was correct to apply K.S.A. 58a-1005(c)(2), and second whether it interpreted the statute correctly when finding it barred Terena's claims.

13

The interpretation and application of a statute of limitations is a question of law, subject to plenary appellate review. *Schoenholz v. Hinzman*, 295 Kan. 786, 791, 289 P.3d 1155 (2012); *A.S. v. Vineyard Church of Overland Park*, 65 Kan. App. 2d 756, 760, 573 P.3d 728 (2025).

II.A.    *Applicable Limitations Law*

Our discussion of the appropriate limitations law necessarily begins by addressing the nature of the claims before us. Janice argues that Terena filed this action asserting, among other causes, conversion and embezzlement, two specific causes of action in tort law dealing with disposition of personal property, and because these are tort claims, K.S.A. 60-513(a)(2) should apply to those claims alleged outside the scope of a breach of trust claim. Although the specific nature of the claims Terena asserts is less than clear, we find that essentially all claims brought in this claim sound as breach of trust.

Under the Trust Code, K.S.A. 58a-1010 authorizes claims against a trustee other than breach of trust but indicates that independent claims under tort and contract law would be subject to the substantive law appropriate to those claims—including the applicable statute of limitations. See, e.g., K.S.A. 60-512(1); K.S.A. 60-513(a)(2) (conversion); K.S.A. 60-513(a)(3) (fraud); K.S.A. 60-513(a)(4) (tort injuries). Terena raised claims against Janice for embezzlement and conversion, but these are essentially the same claim because embezzlement is a crime, not a civil cause of action. See *Blair Milling Co. v. Fruitager*, 113 Kan. 432, 436, 215 P. 286 (1923) (discussing legality of contract to repay embezzled funds); *Miller*, 2024 WL 4521959, at *21 (restating "embezzlement" as "conversion").

14

In its ruling, the district court found:

> "Based upon the court's ruling on the issues of statute of limitations and standing to sue, there is no need to reach the questions concerning conversion or embezzlement *of real property* but the court, from reading the applicable law, does not believe that the transfer *of the real estate* by Janice would constitute grounds for claims of embezzlement or conversion." (Emphases added.)

Terena does not challenge this ruling on appeal, and as a result, we do not reach it. *In re Adoption of Baby Girl G.*, 311 Kan. at 803 (an issue not briefed is deemed waived or abandoned).

Under K.S.A. 58a-1010(b), Terena's purported tort claims against Janice for embezzlement and conversion are necessarily claims against Janice personally, not in her capacity as trustee. ("A trustee is personally liable for torts committed in the course of administering a trust . . ."). But Terena waived any claims against Janice personally at the summary judgment hearing. Even if she had not waived such tort claims, if Terena brought a tort claim for conversion to assert damages resulting from the distribution of personal property, the two-year limitations period found in K.S.A. 60-513(a)(2) would apply to those claims. But Terena admitted her participation in both the division of personal property and the auction of machinery and other items in 2019—more than two years prior to the filing of her lawsuit. For these reasons, summary judgment in favor of Janice, individually, was appropriate on any asserted separate tort claim of conversion or embezzlement, albeit on different grounds than those cited by the district court. *Nicholson v. Mercer*, 319 Kan. 712, 717, 559 P.3d 350 (2024) (reviewing court may affirm judgment as correct for the wrong reason).

Even so, we are not convinced that Terena actually asserted separate tort claims. In her petition, Terena claimed that Janice both embezzled and converted trust property for her own benefit by specifically failing to properly transfer property into the Family

15

Trust and instead "transferring the property into her personal trust." While Terena uses the terms more commonly observed in tort law—conversion and embezzlement—her usage of those terms sounds in trust law. We observe the use of these terms in the Trust Code; for example, in K.S.A. 58a-1002(a)(3), "Damages for breach of trust," the law permits damages "if the trustee *embezzles* or knowingly *converts* to the trustee's own use any of the personal property of the trust, the trustee shall be liable for double the value of the property so *embezzled* or *converted*." (Emphases added.) The claims which Terena brought in her petition mirror this language found in the Trust Code, and so they sound entirely in trust law, not tort law, and specifically, are more properly considered as breach of trust claims. While we are not to create claims for a litigant, we must interpret claims on summary judgment in a light most favorable to the nonmoving party. *Zaragoza*, 320 Kan. at 697. If Terena's claim may be viewed as a tort claim—which would be barred by the applicable statute of limitations—but also as a breach of trust claim—which may survive the applicable statute of limitations—a court faced with summary judgment is obligated to view the claim as one that could survive the procedural bar. As a result, we look to how the law imposes a limitations period on breach of trust claims.

Article 10 of the Trust Code governs the liability of a trustee and the rights of those dealing with the trustee. Consequently, because Terena's claims rely on breach of trust, the limitations specific to the Trust Code in K.S.A. 58a-1005 apply. See K.S.A. 58a-1005(a) and (c) (designating that the provisions apply to "breach of trust" claims). K.S.A. 58a-1005 provides:

> "(a) A beneficiary may not commence a proceeding against a trustee for breach of trust more than one year after the date the beneficiary or a representative of the beneficiary was sent a report that adequately disclosed the existence of a potential claim for breach of trust and informed the beneficiary of the time allowed for commencing a proceeding.

"(b) A report adequately discloses the existence of a potential claim for breach of trust if it provides sufficient information so that the beneficiary or representative knows of the potential claim or should have inquired into its existence.

"(c) If subsection (a) does not apply, a judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within two years after the first to occur of:

(1) The removal, resignation, or death of the trustee;

(2) the termination of the beneficiary's interest in the trust; or

(3) the termination of the trust."

Because Janice never provided any of the beneficiaries with reports, Terena contends that subsections (a) and (b) cannot apply. This conclusion is supported by the statutory language and an unpublished decision of a panel of this court. See *Miller*, 2024 WL 4521959, at *8.

In *Miller*, several siblings quarreled over the administration of their mother's estate. Two siblings argued that the only actionable claim against them related to the transfer of mineral interests and asserted a limitations defense, which the district court rejected. On appeal, our court found that, "[u]nder K.S.A. 58a-1005(a), the limitations period begins when a potential claim is 'adequately disclosed' in a trust report. Here, subsection (a) does not apply because [the trustee] never created or filed any trust reports and gave no notice to his siblings of the distributions during his time as trustee." 2024 WL 4521959, at *8. Instead, the court found that subsection (c)(2) applied, because the beneficiaries' interests in the trust were terminated when the trustee removed the remaining assets of the trust by transferring them to himself and another sibling in 2014. Although the trustee had begun "to syphon trust income to himself" and a sibling years earlier, the only event that triggered the statute of limitations occurred when he transferred the entirety of trust assets to himself in 2014. 2024 WL 4521959, at *8. Because the lawsuit was filed in 2015, the two-year statute of limitations in K.S.A. 58a-1005(c) did not bar the action.

17

Here, as in *Miller*, because Janice admitted she did not provide the beneficiaries with any report, K.S.A. 58a-1005(c) provides the applicable limitations period.

II.B.    *K.S.A. 58a-1005(c) Does Not Bar Terena's Claims*

A plain reading of K.S.A. 58a-1005(c) provides that the two-year limitations period does not begin to run until the first of the three enumerated circumstances occurs: (1) removal, resignation, or death of the trustee; (2) termination of the beneficiary's interest in the trust; or (3) the termination of the trust. Clearly, Janice has not died, been removed as trustee, or resigned her position as trustee of the Max Hacker Trust or the Family Trust, so subsection (c)(1) does not apply. And, whether it be Max's original trust or the Family Trust as discussed below, some iteration of the Max Hacker Trust continues. The matter is complicated because Janice apparently operated the Family Trust in the name of the Max Hacker Trust, but because we do not interpret the facts of this case to have somehow terminated the Family Trust by failing to create the sub-trust at Max's death, subsection (c)(3) does not apply. So, the limitations question then revolves around the district court's application of subsection (c)(2).

Relying on *Miller*, the district court concluded that Terena's causes of action for breach of trust commenced on three dates—first, when Janice transferred Max's undivided one-half interest in the real property from the Max Hacker Trust to the Janice K. Hacker Trust—September 19, 2019, of which a deed was filed and gave "constructive notice to the world at large," citing *LCL, LLC v. Falen*, 308 Kan. 573, 589, 422 P.3d 1166 (2018). Second, when Janice failed to create the Family Trust by not transferring the remaining corpus of the Max Hacker Trust into the Family Trust in 2019, the district court found the trust was devoid of assets and so the limitations period commenced. Finally, the district court determined the limitations period commenced when Janice auctioned off personal property held by the Max Hacker Trust or distributed the personal property to Timothy or herself from the Max Hacker Trust in 2019.

18

We disagree with the district court's interpretation of *LCL*, as rather than finding as a matter of law that the filing of a deed offered constructive notice to the world and unquestionable commencing of a limitations period, our Supreme Court actually found that constructive notice is of the contents of the deed, but this does not equate with a factual finding of ascertainable knowledge of an actionable injury from that deed, and the court was "unwilling to convert a question of fact into a question of law in this way." 308 Kan. at 587. The greater difficulty with the district court's position, though, is that none of the three actions referenced by the district court terminated Terena's interest or that of any other beneficiaries in the Max Hacker Trust or the Family Trust as required for K.S.A. 58a-1005(c) to apply. Notably, subsection (c)(2) does not state that the defining event is the termination of a beneficiary's interest in some *part* of the corpus of the trust but the termination of *all* interest in the trust. As a result, the sale or transfer of some of the property held by the trust, even if done in violation of the terms of the trust, does not trigger K.S.A. 58a-1005(c)(2) so long as some property remains in the trust. In this sense, the present case is distinguishable from *Miller*.

In *Miller*, the trustee removed the assets of the trust by deeding himself the mineral interest leases after claiming the royalties and interest previously paid on the leases. The court noted that the transfer of the mineral interest leases left no assets in the trust to accrue for the beneficiaries of the trust, thereby effectively terminating their interests in the trust as of the date of the transfer. Here, none of the transfers completely divested Terena of her interest in the trust so long as some property remained.

The more complicated matter is the effect of Janice's failure to create the Family Trust. This question is at the heart of the standing issue addressed below. Sufficient for this discussion, we see no factual scenario where Terena's interest was terminated. Janice's failure to create the Family Trust did not extinguish Terena's interest in that trust. On the one hand, the record establishes that Janice intended to administer the existing Max Hacker Trust under the terms of the Family Trust, and Terena possessed a beneficial

19

interest in both trusts. On the other hand, logically and legally, a trust must exist before it may be terminated. If the Family Trust never existed, Terena's interest in that trust could not be terminated. Since the Max Hacker Trust existed at the time of trial and Janice never revoked Terena's beneficial interest in Max's trust, the two-year statute of limitations simply is not triggered by K.S.A. 58a-1005(c)(2) under the circumstances of this case, and we find the district court erred in its application of K.S.A. 58a-1005(c)(2).

II.C.   *Other Procedural Bars*

In her summary judgment motion and appellate brief, Janice also suggests that Terena's claims might be barred by estoppel. As to whether this claim is preserved, Janice argues that she raised the affirmative defense of estoppel in her motion for summary judgment. She did raise the issue; however, her argument there is confined to one sentence:

> "While the record is not clear as to when Terena learned that the real estate had been conveyed from the Max Hacker Trust to Janice's trust, any claim related to the distribution of personal property, where Terena participated in the division of the property that she and [her husband] received, should be barred by the doctrines of estoppel."

In her appellate brief, Janice argues that even if the statute of limitations does not bar Terena's action, we "should still invoke the doctrine of estoppel to trigger the limitation provisions of K.S.A. 58a-1005 or K.S.A. 60-513(a)(3)." The argument, however, is not fully briefed or supported by authority, and as a result has been abandoned. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

Janice also urges us to interpret K.S.A. 58a-1005 as a statute of repose, again referencing the comments to the Trust Code. "Subsection (c) is intended to provide some ultimate repose for actions against a trustee. It applies to cases in which the trustee has

20

failed to report to the beneficiaries or the report did not meet the disclosure requirements of subsection (b)." Uniform Trust Code Comments, K.S.A. 58a-1005. Whether K.S.A. 58a-1005 is designated a statute of limitations or a statute of repose is immaterial to a determination of its proper application in a summary judgment setting. No matter what label is affixed to the provision, summary judgment is inappropriate unless Janice demonstrates that Terena's claims met the conditions required by the statute. As discussed, K.S.A. 58a-1005(c) was not triggered under the facts of this case.

Janice also raises a public policy argument that a wronged beneficiary cannot sit on his or her rights. However, to the extent Janice argues that the circumstances covered by K.S.A. 58a-1005(c) are not broad enough, the argument is made to the wrong branch of government. A court presumes that the Legislature expressed its intent through the plain language of the statute. The Legislature might have commenced the two-year statute of limitations in K.S.A. 58a-1005(c)(2) when any interest of a beneficiary was impaired, but that is not what the statute reads. The two-year limitations period commences when a beneficiary's interest in the trust is terminated.

In summary, the district court properly granted summary judgment in favor of Janice on Terena's conversion and embezzlement claims, to the extent she raised them as separate tort claims but erred in granting summary judgment on the breach of trust claims as barred by K.S.A. 58a-1005(c)(2).

III.    *Standing*

Terena next challenges the district court's standing ruling. The district court adopted Janice's reasoning that the Family Trust was never created—that is, "Janice never transferred any property to the Family Trust nor did she independently establish the trust by obtaining a tax ID number or other indicia of creation," and as a result, the Family Trust did not exist, and "does not have the capacity or legal existence to bring a cause of

21

action." Accordingly, the court found that Terena could not bring suit as a beneficiary of that trust. The court also concluded that Terena lacked standing to bring suit in her individual capacity.

Standing is the question of whether the plaintiff has alleged sufficient personal stake in the outcome of a controversy to invoke the court's subject matter jurisdiction and to justify a court's remedial powers on her behalf. *Stechschulte v. Jennings*, 297 Kan. 2, 29, 298 P.3d 1083 (2013). Standing is a component of subject matter jurisdiction, which may be raised at any time. 297 Kan. at 29. In Kansas, standing requires a plaintiff to demonstrate two initial elements:  (1) a legally cognizable injury and (2) a causal connection between the injury and the challenged conduct. *POM of Kansas, LLC v. Kobach*, 319 Kan. 764, 769, 561 P.3d 506 (2024).

### III.A.  *Standing as Beneficiary*

Janice has not challenged Terena's ability to demonstrate both components of standing as a beneficiary of the Max Hacker Trust, though it was not named in this suit, but contends that the Family Trust was never created and so Terena lacked standing to bring a suit as a beneficiary of the non-existent Family Trust.

Janice's argument can be viewed, in part, as a challenge to Terena's status as a beneficiary of the Family Trust as the real party in interest. K.S.A. 60-217(a) requires civil actions to be brought by the real party in interest, which essentially means the party who has the substantive right to be enforced. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 30, 59 P.3d 1003 (2002); *Torkelson v. Bank of Horton*, 208 Kan. 267, 270, 491 P.2d 954 (1971).

The district court stated it was "perplexed as to why plaintiffs did not bring the action in the name of the Max Hacker Trust" or in the name of Terena as beneficiary of

22

that trust, "in conjunction with the Family Trust," finding both trusts could have been named. A district court, however, should not dismiss an action because it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification, joinder, or substitution of the real party in interest. K.S.A. 60-217. Accordingly, when the district court determined that Terena, as a beneficiary of the Family Trust, was not the real party in interest, it should have allowed her a reasonable time to amend her petition to substitute or add herself as a beneficiary of the Max Hacker Trust. But for reasons discussed herein, although Terena may conceivably have brought her action as a beneficiary of the Max Hacker Trust, such an allowance by the district court was unnecessary because we ultimately find she properly brought her suit as a beneficiary of the Max Hacker Family Trust.

To resolve the standing issue, we must determine, as a matter of law, whether provisions for the creation of a sub-trust on the existence of a condition precedent, here the death of Max, operate automatically or only upon some action by the successor trustee. As a part of resolving this question, the court must interpret the terms of the Max Hacker Trust, which is a question of law subject to unlimited review. *Sutherland v. Sutherland Trust*, 65 Kan. App. 2d 562, 578, 567 P.3d 873 (2025). The primary goal is to implement the settlor's intent. Typically, the court presumes that the intent is expressed within the plain and unambiguous language of the trust. 65 Kan. App. 2d at 578.

### III.A.i. *Upon Max's Death the Family Trust Came into Existence*

The Max Hacker Trust was a revocable trust during Max's life, with Max and Janice acting as co-trustees, as provided in the Max Hacker Trust, Article IV. At Max's death, if Janice survived him, she became the sole trustee and certain property— "tangible, nonbusiness trust property"—held in the trust must be transferred to Janice, as required by the Max Hacker Trust, Article V. Section A. As discussed previously, the

23

Max Hacker Trust directs that upon Max's death the remainder of the trust property is to transfer into one of two sub-trusts:  the Family Trust and the Marital Trust (if necessary).

Janice argued, and the district court adopted the argument, that the terms for the creation of the Family Trust were not self-executing but required action by Janice as the successor trustee, such as tax documentation, transfer of title of assets, and other formalities. We disagree. This rationale fails to render a distinction between *creation* of a trust and *administration* of the trust.

We find no Kansas caselaw addressing this distinction, but the parties each rely on a 30-year-old Kansas Supreme Court case discussing creation of Kansas trusts. *Taliaferro v. Taliaferro*, 260 Kan. 573, 921 P.2d 803 (1996). In that case, and others thereafter, our Supreme Court reiterated the essential elements of an express trust:  (1) an explicit declaration and intention to create a trust, (2) definite property or subject matter of the trust, and (3) the acceptance and handling of the subject matter by the trustee as a trust. 260 Kan. at 578.

In *Taliaferro*, the trial court determined that the Will C. Taliaferro Trust was invalid because the settlor, Will, had not formally transferred title to property he owned to himself as trustee of the trust before his death. Focusing on the fact that legal title was held by Will both before and after the conveyance, our Supreme Court reversed, finding that "there is no requirement that a settlor who also serves as trustee of a trust established by declaration must transfer legal title to the trust property." 260 Kan. at 579. The court reasoned:

> "Although the present transfer of property to the trustee is crucial when the settlor is not also the trustee, or when the settlor attempts to establish the trust solely by transfer, this requirement has not been included . . . for establishment of a trust because it is not necessary in every trust." 260 Kan. at 579.

24

The district court here, along with Janice, relied on *Taliaferro* to find that the Family Trust was never formed because it never received property, and because the Family Trust did not exist, then Terena has no standing as a beneficiary of that trust.

Applying the caselaw on creation of trusts, we consider that the parties do not question Max's intent to create the Family Trust; such is evident in the language of the Max Hacker Trust. And, the language of the Max Hacker Trust also defines the property or subject matter of the Family Trust in Article V to include all trust property, excluding the "tangible, nonbusiness trust property" in Article V, Section A which was to transfer directly to Janice. If the amount of property in the Family Trust did not exceed the amount which could pass free of estate taxes—the calculation of which was clearly defined in Article V—then the Marital Trust need not be created. Witness testimony made clear, and the parties do not dispute, that the total value of Max's estate did not exceed this amount; so effectively, all trust property identified in the Max Hacker Trust, except that property which transferred directly to Janice under section V.A, became property of the Family Trust upon Max's death because Janice survived him.

Although *Taliaferro*, despite its age, remains good law, in *Godley v. Valley View State Bank*, our Supreme Court made clear that the absence of the third element—acceptance and handling of the subject matter by the trustee—has never invalidated a trust, and the Trust Code—adopted after *Taliaferro* was decided—omits this requirement. 277 Kan. 736, 742-44, 89 P.3d 595 (2004).

Kansas adopted the Uniform Trust Code effective on January 1, 2003, and was the first state to do so. The Uniform Trust Code was an attempt to "provide the states with a comprehensive model for codifying their law on trusts." English, *The Kansas Uniform Trust Code*, 51 U. Kan. L. Rev. 311 (2003). Although Kansas caselaw on creation of trusts is sparse, it is generally consistent with the Uniform Trust Code. 51 U. Kan. L. Rev. at 328.

Under the Trust Code, "[t]he terms of a trust prevail over any provision of this code except: (1) The requirements for creating a trust." K.S.A. 58a-105(b)(1). Under K.S.A. 58a-401(1), one of the primary ways "[a] trust may be created [is] by: . . . [t]ransfer of property to another person as trustee or to the trust in the trusts' name during the settlor's lifetime or by will or other disposition taking effect upon the settlor's death."

While Kansas caselaw has not directly addressed whether the "other disposition taking effect upon the settlor's death" means either creation or administration of a trust, the comments to K.S.A. 58a-401 are instructive. Although it is true that "a trust is not created until it receives property," "[a] pourover devise to a previously unfunded trust is also valid and *may constitute the property interest* creating the trust." (Emphasis added.) See Unif. Testamentary Additions to Trusts Act § 1 (1991), codified at Uniform Probate Code § 2-511 (pourover devise to trust valid regardless of *existence*, size, or character of trust corpus). See also Restatement (Third) of Trusts § 19 (Tentative Draft No. 1, approved 1996). These comments support our literal reading of K.S.A. 58a-401(1) to allow the creation of a trust by "other disposition taking effect upon the settlor's death." Accordingly, regardless of so much as an existence of trust corpus, the Family Trust was created at the moment of Max's death by the language in his trust requiring the creation of the Family Trust.

In other words, by the express terms of the Max Hacker Trust, the Family Trust sprang into existence when the condition precedent—Max's death—occurred. The property interest sufficient to create the Family Trust lies in the directions contained within Article V of the Max Hacker Trust—that upon Max (Grantor)'s death if Janice survived him, Janice (as sole Trustee) "shall hold and dispose of the trust property, including property to which" Janice (Trustee) was "entitled under [Max's] will or from any other source," by first transferring all "tangible, nonbusiness trust property" to herself. The remainder of the Max Hacker Trust estate must be set aside in the Family Trust, since the "largest amount that [could] pass free" of estate tax would fit into the

26

Family Trust. This automatic transfer by virtue of the trust language, like a pourover devise, qualifies as an "other disposition" within the meaning of K.S.A. 58a-401(1). See also Restatement (Third) of Trusts § 40(b) ("Property denotes interests in things, not necessarily the things themselves, but necessarily things that are legally capable of being owned [and, ordinarily, transferred] and to which property interests can attach," and, "Trust property may be real or personal, tangible or intangible. It may consist of such diverse rights as undivided interests, terms of years, contingent future interests, and *choses in action*, even *choses* with respect to things that are not specifically ascertainable . . . at the time the trust is created . . . .").

Lending further support for this conclusion is another comment to K.S.A. 58a-401, recognizing that a "trust created by will may come into existence immediately at the testator's death and not necessarily only upon the later transfer of title from the personal representative." The tax requirements for the trust are a separate and independent requirement for the *administration* of the trust. Nothing in K.S.A. 58a-401(1) requires the requisition of a tax number as a prerequisite for the *creation* of the trust.

Because the Family Trust was created upon Max's death, Terena's rights as beneficiary of the Family Trust likewise matured into present and enforceable rights upon Max's death. See *Babbitt v. Superior Ct.*, 246 Cal. App. 4th 1135, 1144, 201 Cal. Rptr. 3d 353 (2016) (finding that a contingent beneficiary lacks standing to compel information from a trustee related to a revocable trust, but after the settlor's death, the rights which were postponed while the settlor was alive "'mature into present and enforceable rights under . . . the trust law'").

The district court acknowledged this language in the comments to K.S.A. 58a-401, noting that a "'pour over devise to a previously unfunded trust is also valid and may constitute the property interest creating the trust.'" But the court went on to find, "However, even if correct, this does not totally resolve the issue of the creation of the

27

Family Trust. The third element of the holding in *Taliaferro* must also be satisfied." But the district court made a legal error through this last statement. As mentioned above, in *Godley*, our Supreme Court clarified that the absence of the third element does not invalidate a trust. 277 Kan. at 742-44.

In conclusion, we find that Terena has standing to sue as a beneficiary of the Family Trust because the Family Trust came into existence upon Max's death, according to the express language of the Max Hacker Trust document. Whether Janice, as acting trustee of the Max Hacker and the Family Trust properly administered those trusts is a question of fact going to the heart of this lawsuit.

### III.B. *Individual Standing*

The district court also concluded that Terena lacked standing, in her individual capacity, to sue Janice. The court ruled that all Terena's claims involve harm to the trust property, not harm to Terena personally and the relief requested devolved to the Family Trust, not to Terena individually.

On appeal, Terena offers no argument on this point, so the issue is deemed waived or abandoned. *In re Adoption of Baby Girl G.*, 311 Kan. at 803. Accordingly, the district court's summary judgment ruling that Terena lacked standing to sue in an individual capacity is affirmed.

### IV. *Merits*

As her final substantive issue, Terena challenges the district court's conclusion that Janice was entitled to judgment as a matter of law on her claims for breach of trust and breach of fiduciary duty. The district court expressly decided that Janice's transfer of the

28

real estate to the Janice K. Hacker Trust and her failure to transfer property into the Family Trust did not amount to a breach of trust or breach of her fiduciary duties.

The district court found that, "[s]hould an appellate court not agree with the statute of limitation and standing analyses," it would address the merits of the case. Although Terena briefly mentions Janice's failure to transfer property to the Family Trust, the bulk of her merits arguments focus on Janice's transfer of real estate from the Max Hacker Trust to the Janice K. Hacker Trust after Max's death. To the extent Terena raised other factual bases for breach of trust in the district court, those claims have been waived and abandoned on appeal. *Russell*, 306 Kan. at 1089 (A point raised incidentally in a brief and not argued therein is deemed waived or abandoned.).

Terena claims that there are no factual disagreements between the parties that Janice transferred the real estate from Max's trust to her own trust without compensation to Max's trust. Rather, she asserts the only questions rely on legal interpretation of the Max Hacker Trust to determine whether Janice's actions were justified.

A breach of trust is statutorily defined as "[a] violation by a trustee of a duty the trustee owes to a beneficiary." K.S.A. 58a-1001(a). Terena contends that the uncompensated transfer of all real property held by Max's trust into Janice's trust was a violation of Janice's duty as trustee to the beneficiaries of Max's trust. The district court determined the transfer was not a breach of any duty and found Janice's actions justified by: (1) the trust provision allowing for the transfer of tangible, nonbusiness trust property to Janice; (2) the trust's consolidation provision; (3) the grants of discretion within the trust documents; and (4) the parties' original desire to equalize Max and Janice's assets between their respective trusts.

Terena challenges the district court ruling on two grounds. First, she contends the court misconstrued the trust by including real property within the scope of "tangible,

29

nonbusiness" property within Article V, Section A of the Max Hacker Trust. Second, she contends that the court erred in finding that Max's trust expressed an intent to equalize the property held respectively by the Max Hacker Trust and the Janice K. Hacker Trust. In passing, Terena also suggests that the district court improperly relied on Janice's discretion as trustee, but she does not develop that argument, and it is deemed waived or abandoned. *Russell*, 306 Kan. at 1089.

IV.A.  *Authority to Transfer*

The district court initially ruled that the transfer of real property from Max's trust to Janice's trust was "expressly authorized" by Article V, Section A of the Max Hacker Trust. Interpretation and application of the terms of a written trust are questions of law subject to unlimited appellate review. *Hemphill v. Shore*, 295 Kan. 1110, 1117, 289 P.3d 1173 (2012); *Sutherland*, 65 Kan. App. 2d at 578.

The goal in interpreting a trust is to implement the intent of the grantor. If the trust language is plain and unambiguous, then the court implements the intent of the grantor expressed through that language. If the trust language is ambiguous, a construing court must place itself as nearly as possible in the position of the grantors and consider the entire instrument to determine intent. *Hemphill*, 295 Kan. at 1118; *Roenne v. Miller*, 58 Kan. App. 2d 836, 844, 475 P.3d 708 (2020).

Again, as noted, Article V, Section A of the Max Hacker Trust reads:

"Upon Grantor's [Max's] death, if Grantor's wife survives, Trustee shall hold and dispose of the trust property (including property to which Trustee is entitled under Grantor's will or from any other source) as follows:

"A. Tangible, Nonbusiness Trust Property. Trustee shall transfer all tangible, nonbusiness trust property, including (but not by limitation) jewelry, clothing, furniture, furnishings, books, pictures, and automobiles, to Grantor's wife."

The district court found that this "tangible, nonbusiness trust property" included tangible *real* property because the trust did not limit the transfer to tangible *personal* property. The argument may be supported by the use of "tangible personal property" in other sections of the trust. For example, Article VI, Section A states:  "Grantor may prepare a written statement or list directing Trustee to distribute at Grantor's death—if such assets are held in trust—items of tangible personal property (other than money, evidences of debt, documents of title, securities, and properties used in trade or business)." The specific use of "tangible personal property" in this section for special gifts could suggest an intent to mean something different in the broader term, "tangible property." See *Towne v. Unified School District No. 259*, 318 Kan. 1, 9, 540 P.3d 1014 (2024) (applying canon of construction, *expressio unius est exclusio alterius* [the inclusion of one thing implies the exclusion of another] to construe ambiguous statute).

But the term "tangible, nonbusiness property" in Article V cannot be viewed in isolation. Immediately following the term is a nonexclusive list of illustrative items. None of the listed items include or even suggest real property. When an illustrative list provides items of one kind to the exclusion of other items, courts often employ a canon of construction to interpret a provision to exclude the type of item unnamed in the illustrative list. See *Woessner v. Lab. Max. Staffing*, 312 Kan. 36, 48, 471 P.3d 1 (2020) (applying canon of construction, *ejusdem generis* [of the same kind], to interpret ambiguous statutory provision).

As a result, contrary to Janice's argument and the district court's interpretation, the phrase "tangible, nonbusiness property" found in Article V is ambiguous. None of the trust provisions conclusively establish Max's intent to transfer the real property to Janice at his death.

Without a clear intent on the face of the trust, we are left to put ourselves in Max's position and consider the entire trust instrument to determine his intent. Schedule B of the

31

trust gives us some insight, as it demonstrates Max's intent to transfer to his trust "all real and personal property" he owned at the time the trust was executed as well as all real and personal property he acquired thereafter. A mirror image Schedule B was included in Janice's own trust. We could surmise that this means that Max and Janice intended to split all real and personal property between them. Janice's original trust contained nearly identical language to Max's trust, and contains the same "tangible, nonbusiness trust property" provision. Both trusts remained revocable until the death of the grantor; then the trusts became irrevocable and provided for income to the surviving spouse during his or her lifetime. Article V, Section B, Subsection 3.a.

Janice contends that the intent of the grantors in both the Max Hacker and Janice Hacker trusts was to reunite ownership of the property in the remaining spouse at the death of the other. Perhaps this was the intention. An equally plausible intent, however, could have been to preserve some real property within each trust for the benefit of the beneficiaries—an intent which might be defeated if all the real property transferred to the surviving spouse, who retained the right to revoke his or her own trust while alive. In fact, in her later amendments to her trust, Janice drastically revised the way the real property would be distributed after her death from how the real property would have been divided had it stayed within the Max Hacker or the Family Trust.

Two pieces of circumstantial evidence suggest that Max's intent was not to convey real property to Janice through the "tangible property" clause of Article V, Section A. First, Max and Janice created nearly identical trusts for themselves. The most obvious conclusion to be drawn from this process is that Max and Janice wanted to control how the surviving spouse used and distributed the deceased spouse's share of the property. Second, when testifying about the decision to transfer the real property, neither Seibel nor Janice referred to the "tangible property" clause to argue that the clause directed Janice to transfer all the real property in the Max Hacker Trust to herself. Seibel cited to the shared

32

intent of Max and Janice to divide the property equally and to the Max Hacker Trust language generally.

In any event, the "tangible property" language of Article V, Section A does not unambiguously encompass real property. The district court's interpretation of the provision as unambiguous is erroneous. Because nothing within the trust clarifies this ambiguity, the district court should entertain evidence regarding Max's intent with respect to the transfer of real property held by his trust.

For purposes of summary judgment, the court must adopt all facts and inferences drawn from those facts in a light most favorable to the nonmoving party—here, Terena. Given the ambiguity of the language, and on the record before us, our required viewing with respect to "tangible, nonbusiness property" within Article V, Section A would require the exclusion of real property. Accordingly, viewing Janice's transfer of real property from the Max Hacker Trust into the Janice K. Hacker Trust without compensating the Max Hacker Trust, in a light most favorable to Terena, would not be justified by Article V, Section A for purposes of summary judgment.

IV.B. *Equalization of the Trusts*

The district court also found that Janice's transfer of real estate from Max's trust to her own without compensation to Max's trust "adheres [to] Max and Janice's original intent to equally divide their marital estate into two trusts." Though the district court's decision does not provide factual support for this conclusion, we observe it is likely based on testimony from Seibel and Janice and the schedules of property assigned to each trust at their inceptions. Originally, the trusts for Max and Janice proposed to transfer an undivided half interest of the real property and investments into each trust. After speaking with their investment advisor, however, Max and Janice transferred the bulk of their investment property, including Janice's investments, into Max's trust to obtain potential

33

tax benefits to Janice at Max's death. They did not equalize the trusts by moving real property into Janice's trust at that time.

Max died approximately six months after the change to the property distribution between the two trusts. In her deposition, Janice confessed that, when the trusts were created, she had no idea about what property was placed into their respective trusts. She also testified that she knew that Max had more property in his trust because "he liked to have things in his account." Further, Seibel testified that the trust property was interchangeable and that she believed that investment property was transferred out of Janice's trust to compensate Max's trust for the real property transferred into Janice's trust. But the investment property had been transferred into Max's trust before he died, and before Seibel became Janice's lawyer. At the time Janice transferred the real property out of Max's trust into her trust, the Max Hacker Trust had become irrevocable, and no corresponding value was transferred back into the Max Hacker Trust.

Janice argues that the record demonstrates that the grantors' original intent was to divide the marital assets equally. The evidentiary support for this argument is the schedules of property used to fund the trusts, as discussed in the prior section. Schedule A in each of the trusts purports to fund the trust with an undivided one-half interest in several investment portfolios. Schedule B simply transfers each grantor's interest in their real property into their respective trusts. Presumably, this also was a one-half interest in the real property. The parties do not suggest that either Max or Janice owned less than one-half of the real property in question.

The schedules and Janice's uncontroverted testimony about their intent in creating the trusts is persuasive evidence that, at the time the trusts were created, Max and Janice intended each trust to hold an undivided half-interest in the marital property. But that intent clearly changed when they consulted their investment advisor and decided to take advantage of the potential tax benefits of consolidating the investment property into

34

Max's trust. Janice knew about this change and did not object. But at the time, Max and Janice did not transfer the real property into Janice's trust to balance the values of the trust properties. This transfer may or may not have been evidence of a change in intent. Although Seibel, Janice's litigation attorneys, and the district court presumed that the grantors' intent did not change, Janice testified she knew nothing about the property placed in her trust, and she did not testify that Max told her what his intent was regarding the failure to transfer a corresponding amount of the real property to balance the transfer of investments. As a result, the conclusion about Max's intent at the time he transferred all the investment property into his trust is based entirely on conjecture. This does not support summary judgment in Janice's favor.

Terena argues that Max's intent ultimately does not matter, because under Kansas law, once Max—as the settlor of his revocable inter vivos trust—died, the Max Hacker trust became irrevocable. At the moment a trust becomes irrevocable, Terena argues, the assets inside the trust are permanent. As a result, she argues that even if Janice and Max Hacker had wanted to simply "even out the assets," any such transaction must have necessarily been completed during Max Hacker's lifetime—not after.

This statement of permanence is generally true. See *Neeley v. Neeley*, 26 Kan. App. 2d 924, 926, 996 P.2d 346 (2000) (noting that once the settlor died, "the Trust became irrevocable and unmodifiable"). But while this maxim is typically true, it has many exceptions under Kansas Trust law—exceptions which the parties have not explored at this point of summary judgment.

The parties did not raise, nor did the district court then analyze, the ways in which a trustee might, within the strictures of Kansas law, remove property from an irrevocable trust and transfer it elsewhere, and how those legal exceptions may, or may not, be overridden by trust language. Given our remand on the procedural and standing bases, and our finding that material questions of fact remain as to the meaning of the phrase

35

"nontangible business property" within the trust, we leave these uninvestigated questions for another day.

The district court found there was "no question" regarding Max's intent to equally divide the property between the Max Hacker and Janice K. Hacker Trusts, and found the language of the Max Hacker Trust unambiguous, but for the reasons described, we disagree. Because the language of the Max Hacker Trust remains ambiguous regarding "nontangible business property," and Janice has provided no legal basis supporting the transfer of the real property, summary judgment was inappropriate because we must view all evidence and reasonable inferences in favor of the nonmoving party.

V.      *Sanctions and Attorney Fees*

Upon granting Janice's motion for summary judgment, the district court awarded her attorney fees, finding "that in the interest of justice and equity, all attorney fees incurred by Janice as trustee of the Max Hacker Trust in defense of this case should be awarded to her from that trust." In addition, the district court issued sanctions against Terena for "her fraudulent representation of the ages of her children in answering interrogatories on their behalf after they were added as plaintiffs without their knowledge or consent."

In a separate order, the court found Janice's claim of $8,466.33 in attorney fees and $1,130.98 in litigation expenses reasonable as a sanction against Terena for work associated with the addition of the children, including deposition time, interrogatories, review of the amended petition, and preparation of the motion for sanctions. The court found Janice's remaining litigation attorney fees and expenses to be reasonable and awarded her $87,942.98 to be paid from the Max Hacker Trust. In her initial briefing, Terena challenged both the sanctions lodged against her and the award of fees from the Trust.

36

As outlined above, Terena sought a stay of enforcement of the sanctions order, which was ultimately denied by the district court. Considering that denial and facing the accrual of statutory interest if she posted a supersedeas bond pending resolution of the appeal, Terena paid to Janice the outstanding sanctions amount. In a status report to our court, Terena reported she "ultimately settled the outstanding debt and thus the matter was addressed. All related motions are moot." We issued an order asking the parties to address the circumstances of this case as they relate to the law on acquiescence. See *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006) ("A party that voluntarily complies with a judgment should not be allowed to pursue an inconsistent position by appealing from that judgment."). Terena responded to this order by stating: "Appellants no longer wish to pursue the issue of the propriety of the District Court's . . . sanctions against Terena Becker because she has already paid the full amount that was owed." As a result, we do not consider the issue of sanctions.

### V.A.  *Attorney Fees*

In Kansas, a court may not award attorney fees unless a statute authorizes the award or there is an agreement between the parties for allocation of fees. Whether the court possesses the authority to award attorney fees is a question of law subject to unlimited appellate review. Where a court possesses the authority to award attorney fees, its decision to award fees is reviewed for an abuse of judicial discretion. Similarly, the amount of fees awarded is subject to abuse-of-discretion review. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 208, 506 P.3d 267 (2022).

Terena concedes that K.S.A. 58a-1004 grants the district court the authority to award attorney fees "'as justice and equity may require.'" Under this authority, a court possesses broad discretion to determine both the amount and the recipient of attorney fees. *Cresto v. Cresto*, 302 Kan. 820, 848, 358 P.3d 831 (2015). Judicial discretion is abused when a court's decision constitutes an error of fact or law or is otherwise so

arbitrary, fanciful, or unreasonable that no other judge in the same position would decide similarly. *State, ex rel. Secretary, DCF v. M.R.B.*, 313 Kan. 855, 861-62, 491 P.3d 652 (2021).

Terena does not challenge the reasonableness of the amount of attorney fees submitted by Janice but challenges the court's exercise of discretion to award any fees. Specifically, Terena complains that the district court's general award of attorney fees against the Max Hacker Trust provides no explanation for the award. The court's explanation is contained in a single sentence: "The court finds that in the interests of justice and equity, all attorney fees incurred by Janice as trustee of the Max Hacker Trust in defense of this case should be awarded to her from that trust."

While this reasoning is thin, Terena did not object to the lack of findings. Although a district court has a duty to provide adequate findings of fact and conclusions of law on the record to explain a decision on contested matters, the defendant must object to perceived inadequacies in the ruling to permit the court to correct them. K.S.A. 60-252(a)(1); Supreme Court Rule 165(a) (2026 Kan. S. Ct. R. at 232); *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378, 855 P.2d 929 (1993). When no party objects, an appellate court presumes the district court found all the facts necessary to support its judgment unless the record fails to support that presumption. *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 12, 327 P.3d 1014 (2012).

Given the district court's summary judgment ruling, the court did not abuse its discretion in concluding that Janice should not be personally responsible for the attorney fees incurred in defending her actions as trustee. The district court concluded that Janice managed the Max Hacker Trust appropriately within her discretion as trustee, and so it found that Terena's lawsuit, while not frivolous, lacked legal merit. Accordingly, equity supported the district court's position—at that time—that the Max Hacker Trust should pay her attorney fees. See *Culliss v. Culliss Trust*, 62 Kan. App. 2d 293, 307, 514 P.3d

38

376 (2022) ("An award of attorney fees will be found reasonable if the litigation proved beneficial to the trust estate. And legal proceedings benefit a trust estate if questions are resolved so the estate can be properly administered.").

That said, we now reverse the district court's summary judgment decision and remand the case for further proceedings. In this light, the district court should reconsider the attorney fees issue at the close of litigation. Whether the litigation ultimately proves beneficial to the trust estate will be a factual determination for the district court upon final resolution of the case. *Culliss*, 62 Kan. App. 2d at 307.

CONCLUSION

In summary, as reasoned above, we find the Trust Code supplies the applicable limitations period, and the two-year statute of limitations simply is not triggered by K.S.A. 58a-1005(c)(2) under the circumstances of this case. As a result, the district court erred in its application of K.S.A. 58a-1005(c)(2) and this case was not filed outside the limitations period. In addition, we conclude that Terena has standing to sue as a beneficiary of the Family Trust because that trust sprang into existence upon Max's death, according to the express language of the trust document. Whether Janice, as acting trustee of both the Max Hacker and the Family Trust properly administered those trusts is a separate question.

As for whether Janice had the authority under the Max Hacker or Family Trusts to transfer real estate out of the trust(s), we find the trust language ambiguous and material questions remain regarding Max Hacker's intent such that summary judgment was inappropriate.

Finally, although we find no abuse of discretion by the district court in ordering Janice's litigation fees to be taken from the trust funds, in light of our decision herein, we direct the district court to reconsider this issue at the close of litigation.

Reversed and remanded with directions.